Good morning, Your Honors. May it please the Court, Michael Velchick for United States Defendants Appellants. I'd like to reserve two minutes for a reply. In January 2025, during the Biden administration, CBP conducted a three-day operation that resulted in 78 arrests and stopping named plaintiffs. Significantly, plaintiffs do not allege that they have been stopped multiple times, nor do they allege that the government has repeatedly returned to the same locations as part of its enforcement operations. Plaintiffs therefore fail to differentiate their concerns about a potential future injury from those risks associated with the 8 million other residents throughout the Eastern District of California. As Justice Kavanaugh explained in his concurrence in Perdomo, Lyons told us that standing for future injunctive relief does not exist merely because a plaintiff experiences a past harm and fears a future injury. Rather, like the plaintiffs in Lyons, like the plaintiffs in Perdomo, here plaintiffs have no good basis to believe that they themselves will be stopped and subject to an unlawful stop in the future, and certainly no basis to believe that such a future unlawful stop is imminent. So I'm going to stop you there. You go first. It's all right. I'm going to ask you to take those one at a time because I think Lyons and Perdomo are very, very different cases. So can we talk about Lyons first? Yes. Obvious ways to distinguish Lyons, which of course are in the briefing, so you won't be caught off guard. But let's just review those. You've indicated you think that the government's position is that Lyons is not distinguishable. So one difference between this case and Lyons is that the plaintiffs in this case don't have the ability to avoid, as in Lyons, avoid getting arrested and thereby avoid the alleged chokeholds. Another is that the use of force in Lyons was, there wasn't a showing that it was an established policy. But here we have a finding by the District Court of a custom or a pattern or practice. So could you speak to those things, please? Absolutely. We do think... Forgive me. There's one other point. Sorry. The other obvious, which I really should give it to all at once. The other difference, of course, is that Lyons had one event, one very traumatic event. But in this case, we have a sweep. It involved many more people over a three-day period of time. And then several indications in the record, as you appreciate, that the government would be back with more of the same. So could you address those points, please? And if I forget one, please let me know. Yes. I'll try to stay out of your way. So we fully acknowledge that there are some differences in Lyons, and you've identified them. We still think that Lyons controls. With respect to the first about how, you know, someone could avoid what might happen. I mean, first, we would point out that at least Justice Kavanaugh and his concurrence did not find any of these cases. That's Prodomo. That's Prodomo. We're talking about Lyons. Yes. I mean, we do acknowledge that that is a difference. They still have to establish a sufficient likelihood under Clapper that it's reasonably likely, and we don't think that they can do so. I do want to emphasize also that even to the extent that someone suffers a constitutional injury, such as being subject to an unlawful stop, I mean, there are other remedies, too. And so to the extent that individuals are subject to Title VIII proceedings, they can raise those defenses in Title VIII. They have back-end review by this court. But, counsel, can you stay on the question? Because I'm asking you to talk about, you glommed onto Lyons right away. You invoked it. And I think it's really factually distinguishable. So it would help me. I'm only one of three. But if you could defend that position, that would be helpful to me. So that's what I'm looking for. Clapper is equally distinguishable in terms of a very speculative future harm. And that's far, far end of the spectrum from where we're at here. So I'm all ears. But if you could stay on the question. What I would like to best communicate this morning is that even if there are these subtle differences, the strongest or there are noted differences, the strongest commonality and why we think it controls turns on the undifferentiated risk. But the most important part to Lyons from our perspective is that the risk that any individual might suffer this in undifferentiated as opposed to everyone in the public at large. And our concern here is that at least based on the facts as they appear in the complaint and before the preliminary injunction, there's no reason to think that these particular plaintiffs are more or less likely to suffer. That's the point I want to focus on a minute, because I want to understand the government's position on and what the standard is a sort of certainly impending, right, is the government's position. And it seems like from your argument, it might be that you really do have to make an individualized showing that me as person X. Is going to have this experience before versus any level of of a group threat. Right. So you say in your brief that the plaintiffs are no more are. They're not at risk more than any other individual in the geographic area subject to this injunction. And I don't understand that because we know from how this operation unfolded that it was targeted at a particular subset of the population. It wasn't targeted to the same degree to every single person living in this geographical area. And so if a person shows I'm part of the subset that is being targeted by this operation, aren't they in a different position than people who are not part of the subset? So two points. So first, when we emphasize the issue of recurrence, as I think the term that appears in the case law, I mean, we're borrowing from the Ninth Circuit precedents that I think have have focused on that analysis. I think in Hodgett and Sturgins, it was dispositive and irreparable harm. But in a lot of the standing cases, all of the court's opinions focus on, you know, are there any facts where at least someone was subject to a recurring injury? And I think that speaks to the likelihood that someone might be subject to this harm in the future. If you're going to stake out that position, then you're authority that I think much closer to being on point, the Melendez case and the LeDuc case. Yes. So those are warrantless searches of migrant housing, right? And then allegations that police in, I think, Phoenix were stopping suspected migrants without probable cause. Yes. So we found standing in those cases. So yes, happy to address. With respect to LeDuc, there were specific findings of the likelihood of recurrence. I think that was important. And I would also emphasize that it was geographically localized, that they were focused on specific housing in certain farming locations, that the government was continuing to return to the same places. And that increased the likelihood that someone might suffer a future harm there. With respect to Melendez, I think that's a harder case for us. We, again, I don't want to pivot to Perdomo, but we do think that that signals where I think the Supreme Court's mind is. But even with respect to that, I mean, I would also point out that this was a three-day operation. It was concluded, I think, for at least a month since the complaint was filed, as opposed to, I think, in Melendez. I believe it was litigated over a course of five years. I think there was a lot more evidence and concerns that there were continuing operations ongoing. And another important distinction, from my perspective, is that at least here, the government is agreeing with everyone, with the district court, and I think with plaintiffs, about what the appropriate policy and standard should be. We want to make sure that, as important as it is to enforce our immigration laws, we want to do so in a way that honors the Fourth Amendment and is consistent with the statutes and regulatory requirements. And our policies here have done that, unlike in Perdomo or other cases where there's questions about, you know, is the policy lawful or not, or even in Lyons, you know, is that something that the government really can do? Here, at least, we agree that we want to apply the Fourth Amendment as everyone agrees it should be understood. There was a brief three-day operation. That is over. We have a new administration, two new secretaries. We currently do not have any interior enforcement operations. And yet you're strenuously objecting to the district court's injunctive relief that requires application of the Fourth Amendment, compliance with the Fourth Amendment. We agree with everyone about the appropriate standard for the Fourth Amendment. In general, we always oppose, you know, a court having an injunction hanging over the head of the federal government. I think this was discussed in Lyons. It discussed the separation of powers concerns, partly in horizontal, but also vertical separation of powers, just as Kavanaugh addresses this specific issue in a paragraph in his concurrence about judicial super... Can I ask just a question? Because I'm interested in the Supreme Court precedent. When was the last time that a Supreme Court majority relied on Lyons in a context similar to this? Certainly, Perdomo is the latest signal that I'm aware of. I don't have that at my fingertips. That wasn't a majority in the Supreme Court, so... I mean, we do think that the majority's decision to grant the stay is informative to the court and instructive under Boyle, but I don't have a quick case... But we don't have a reasoned analysis, is I think what you're indicating. We don't have a reasoned analysis. The only comment that I would make on that, other than referring to Boyle and Justice Gorsuch's concurrences, NIH, is that, I mean, we do have the arguments that appear before the court. And I do think it's instructive that a lot the same arguments on standing that appear in this case also appeared by plaintiffs in Perdomo. But weren't there arguments other than standing? Yes, so logically... So that's the thing. I mean, in terms of, like, I get that we're supposed to sort of read the tea leaves in terms of the signals that the Supreme Court is giving. But if the Supreme Court is facing more than one argument and then doesn't give any reasons for why it did this or that, how are we supposed to know, like, which thing it was motivated by, right? Like, I don't know how to read those tea leaves. We're looking at the same thing. I fully understand that they had multiple issues. There are logical ways of divvying up the votes to suggest that some rested their decision on one as opposed to the other. I'm just pointing out that the first argument that the government was making, the principal argument that the Ninth Circuit had addressed, the argument that was front of briefing, was standing. And so I'm not here to suggest that the Supreme Court's stay decision necessarily controls or binds this court. I do think it's important context, and I know the court's aware of that. We're doing kind of a mix and match. All right. But you're not directly challenging LeDuc as being the law of this circuit and controlling on us, are you? I mean, our position is that Justice Kavanaugh's reasoning and his concurrence is the best evidence of how lines in Article III apply to these patterns. We understand it's persuasive. He spoke for himself. We do think that the stay decision is instructive. Our position, though, is that we would still prevail under all Ninth Circuit case law as it exists. Justice Kavanaugh gave us more. We have some recent analysis from him, although it's at a very early stage. We don't know what the rest of the court was thinking. I agree with Judge Forrest on that. And that's where we are, left at that stage. But Justice Kavanaugh was looking at and I think making really important observations about the very different injunctive relief that was granted in Prodomo and how it didn't really make sense. In that case where there's an injunction, I think it identified four different factors and the ruling was these factors, these particular factors alone or in combination, can't rise to the level of. And I think what he was suggesting there is that's an unworkable injunction, right? That's unworkable because law enforcement officers are always taking into account the totality of the circumstances and we know what else might be in play. And so on that basis alone, the Prodomo injunction seems to me to be very problematic and quite different from what we're looking at here. Can I speak to that? Sure. Fully acknowledge that there are independent bases. He gave discussions of both issues. I do, however, think that the discussion that you raised does cut in our favor in at least two respects, at least on the vagueness of the injunction point. The fact that this injunction is part of the law, we can talk about that later. But specifically with respect to standing, I do think that there are material differences between this case and Prodomo that make this easier and this is one of them. I mean, at least in Prodomo, the government had large-scale operations, 2,800 arrests. It specifically wanted to continue those operations and it wanted to do so under its interpretation of the Fourth Amendment, which differed from what the district court wanted and it differed from the plaintiffs. Here, separate apart from the scale, the fact that the operation is over, I mean, our view is that no, we all agree on what the policy should be. We are recommitting to that. I can inform the court that we have completed training for all 900-some agents. We have sent out... I'm going to stop you there because you're going outside the record, but we are going to circle it back about the status quo. That will be helpful in a minute. So go ahead. But to the extent that the government does not object to what we think should be the correct policy, I think that undercuts the suggestion that plaintiffs have a high likelihood of suffering the specific type of deprivation that they might suffer in the future. Well, then we're going to go off to voluntary cessation, I think, if we get into that. So you wanted to say some time for rebuttal? I'd like to save two minutes, but I'm happy to answer any questions. I have a couple more questions before you sit down. So I want to come back to a question that I asked before to make sure I understand what the government's position is. Is the government's position that you can meet the standard for standing for prospective relief based on a showing of a showing of imminence to a subset as opposed to a showing of imminence to just one individual? Meaning like if I show that I'm a member of a subset and the subset of people has an imminent risk, then I could meet standing. Does the government agree with that sort of generalized theory or no? We think that standing is not dispensed in gross. Every individual plaintiff needs to show standing with respect to himself. If there were a recurrence, I think that would be the best evidence that that individual suffers a similar injury. But my understanding of the court's precedence, it does focus on whether each individual and whether that's a single person, whether that's a group, whether that's associational standing, or whether it's class action. At least someone needs to be able to demonstrate that they have suffered an injury, in fact, that's sufficiently concrete, particularized and reasonably likely under Lyons and Clapper. So you would think here to meet standing, you're going to have to show this sort of repetitive stopping of a particular person is repetitively stopped or that there are repetitive stops in a particular location where the particular person is located. And something like that is the only way to do it? I think it might be slightly more nuanced. So I do think that each individual plaintiff needs to demonstrate a sufficient likelihood of future harm. I think the fact that they can't identify anyone, whether it's a named plaintiff or someone else who has even been stopped multiple times, and that the locations of these activities as they appear in their complaint and in their declarations, which seem to vary from driving on cities, highways, from agricultural locations, the fact that they reference potential future enforcement actions in Sacramento, which is 300 miles away. We do think that their specific allegations are insufficient to suggest that anyone, whether it's the named plaintiffs or the organizational plaintiffs, has injury, in fact, sufficient to confer standing based on Lyons. Okay. Two of three questions then is what is the government's position on what use we can make of these statements made by government First, the best evidence of the government's positions are the official statements that the government makes in our musters and our court briefings, rather than social media posts. And I would refer the court to, I believe, Hawaii Mandel are the typical precedents that describe what weight should be given to those statements. Second, even taking all of those social media statements at face value, all of them reference potential future operations to potentially enforce our nation's immigration laws, but none of them makes any suggestions that they want to do so in a way that violates the Fourth Amendment statutory regulatory statement. So we don't think that that speaks to any intent or likelihood of future violations of the Fourth Amendment. Would you agree that it's fair to say that it speaks of an intent by the agency to do more of the same? It doesn't say they're going to do it differently. I would, no, I would strongly reject. I mean, we do not. Why? Because I think unlike some other cases, and maybe this circles back to the point that Your Honor raised originally, there is no official policy that people are challenging as unconstitutional. To the extent that there are allegations, we think that they're, you know, people have phrased it in a pattern or practice as opposed to the government's position that we will conduct searches in a way that violates the Fourth Amendment. We dispute specific allegations as to specific searches. We have recommitted and clarified our position about how the Fourth Amendment should operate. But I think all of that, I think, informs that, you know, the government's entitled to a presumption of regularity. To the extent that we choose to engage in future enforcement operations, we are committed to doing so in a way that respects the Fourth Amendment. And I read those statements in that context. What do we do with the finding of fact that the district court made about the pattern or practice? You know what this evidence is here. Their argument is quite contrary to Perdomo. Their argument is that rather than looking at four specific factors, that what the agents did in this case is they just looked at basically a racial profiling. Yes. And didn't consider any of the surrounding circumstances. In fact, vetted I.D. out of the hands of people who offered it and so on and so forth. I know, you know, the facts very well. So just quickly, because I want to get to Judge Forrest's other question, but could you respond to that? Yeah, I mean, we do think those are allegations of inconsistent enforcement and at most a pattern in practice. But we still don't think that that is a policy, which I do think is a way to distinguish cases. I appreciate that distinction. Thank you. Last question is I want to be clear on why the government thinks that Melendrez and LeDuc are distinguishable. So what is the what is the thing about those cases that makes them not applicable here? LeDuc, I would emphasize a specific court finding of likelihood of recurrence. And I believe there may have been multiple individual stop multiple times. We also emphasize that it was localized to the government's plans to conduct specific operations at the same places that would make it more likely for this group of plaintiffs to be subject to the same types of deprivations in the future. We also emphasize that the government there had policies where individuals disagreed whether they were lawful. Here, we think that we have a lawful policy going forward. At most, there would be disagreements about whether that policy is being appropriately enforced by the relevant actors. And then fourth, I would also I think that the time frame is, I think, a relevant factor. I believe in both of those cases, I think they went on for over five years. There was a lot of data. People had raised the problem. It had not been addressed in order to address. I believe it was five years of alleged government misconduct. The court did take, you know, a decision to, you know, find standing and give the relief in those cases. Whereas here, and I would emphasize that this was a three-day operation. It concluded. It has been over even for a month before the complaint started. And so I think those are a couple of ways that we would distinguish it separate apart from the predominant development. Did you have another question, Judge Forrest? Okay. We've taken you way over your time. For planning purposes, when you come back, you're three and a half minutes over now. For planning purposes, we'll put two minutes on the clock for your rebuttal. Understood. Thank you, Your Honor. You're welcome. We'll hear from opposing counsel, please. Thank you, Your Honors. May it please the court, free Bernwanger for the plaintiffs. The plaintiffs agree that in this case, each plaintiff needs to demonstrate that they have to seek prospective relief. They have done so here because they have shown that there is a realistic threat that the injuries they have already experienced will recur. And they have shown that threat based on concrete evidence that substantiates their fears. This record is full of it. The government claims as a litigation position that this is a case about inconsistent enforcement, but the record shows nothing but consistency in the defendant's conduct. Starting with the fact that all of the plaintiffs were harmed in essentially an identical way, and the government does not dispute that the stops and arrests that the plaintiffs experienced violated their constitutional and statutory rights. I think that's right. His argument is different as I understand it. And that is that he's saying, it's almost a ratio, right? A likelihood. What he's saying is that perhaps there was rogue enforcement, but there wasn't an official policy. And I hear him saying then that we have to look at the standing on a plaintiff by plaintiff basis. And each one of them has to establish the likelihood of future injury. Well, I agree with the second part of what said and what my colleague said. He's saying it's just too remote. He's saying it's too speculative. Could you speak to that? Yes, Your Honor. This is not speculative. And there are really, I think, five categories of evidence in the record that provide that concrete evidence that substantiates the plaintiff's fears that they will be harmed again. And I'll note before I get into each that the Supreme Court has really rejected the government's view here that just because a lot of people could be harmed, it's harder for individuals to show that they have demonstrated a concrete and realistic threat. In scrap, the Supreme Court said that if it adopted that type of analysis, then the most widespread harms would go unaddressed. I don't think that's what he's arguing. I don't think he's saying just because a lot of people are at risk here that this is not a problem. I think he's saying that you have to look at the number of people who are arrested and the number of people in the area. And that it still becomes very speculative that any individual would be subject to this type of unlawful conduct in the future. Well, let's look at the record on defendant's conduct here. So here the plaintiffs have already been harmed. That is evidence that they will be harmed again. They've been harmed in identical ways. And the class members whose declarations detail the way that they, too, were pulled over by agents who had no knowledge of who they were or their immigration status and arrested without any further evaluation of their likelihood of escape or a warrant. Those declarations are all consistent and show a consistency across the defendant's practice. These were not isolated incidents. And the defendants... Can I ask you, forgive me, I know I'm interrupting, but on that point, is there anything in the record that will allow us to infer that there perhaps were a handful of rogue agents? Any description of the people? I think they were masked, and so it's very difficult, but I'm just wondering if there's anything that would allow us to make that inference. No, Your Honor. There's no evidence that this was an operation of rogue agents. We know that there were 60 agents roaming... We're not communicating. What I'm suggesting is, is it possible from this record to infer that the misconduct, that's my word, that the violations were maybe committed by a small subset of those 60 agents? No, Your Honor. And we know from the defendant's own records, which they didn't put into evidence that the plaintiffs were able to obtain and enter into evidence, that in 77 out of 78 of the arrests that the defendants made, their agents had no knowledge of a person's immigration status before the initial stop. That shows staggering consistency across their practices here, and it certainly provided a sufficient record for the district court to make its findings that the defendant's conduct amounts to an unlawful practice, both as... I'm going to switch gears a little bit. I'm concerned about the district court not having actually done a standing analysis for the prospective relief, and why isn't that legal error? It's not legal error because the government didn't raise the issue, so... But it's standing. It's jurisdictional. It doesn't matter. It's standing, and it means that this court certainly can and should take on the issue on its own. We certainly don't argue that this court doesn't have jurisdiction. We think this court should decide the issue here, but the factual findings that the district court made as to the merits and as to irreparable harm are really... I mean, that's the problem, though, because the district court doesn't actually recite or indicate in any way in its decision that it's about this standing requirement for prospective relief, and unlike Melendrez, doesn't actually make specific findings related to that standard. So we don't have the... I mean, we have findings related to other things that are sort of adjacent or relevant to the question, but not a finding specific to that governing standard, and I... It sort of seems like we're missing a link. I would have two responses to that, Your Honor. First, the district court did make a factual finding that there is an ongoing practice that violates the plaintiff's constitutional and statutory rights. She found that on page 77 of the... My understanding of her decision is that she'd never made a finding of sufficient likelihood of future injury for these plaintiffs, and that is a difference from Melendrez, where the district court did make that specific finding. So am I missing something in her decision that's not you want me to make sure I look at again, or do you agree with me that she did not make a finding specific to that point of these people's likelihood of future injury? We think that she did make that finding in the irreparable injury analysis, but we agree that there wasn't prospective standing analysis. But what matters here is that the record is unrebutted and the district court's factual conclusions and legal conclusions have really not been challenged by the defendants at any stage. Can you help me with that? Can you help me with what the findings with respect to what the plaintiffs were doing, their conduct, and the extent to which it's repetitive? Did the findings go to that? Well, Your Honor, so the district court essentially credited the facts that the plaintiffs had put in the record because, as she put it, there was no substantive conflict. The defendants did not enter any rebuttal evidence. They entered no evidence, for example, asserting that there were lawful bases for their stops, asserting that they did conduct. But my question went to what the plaintiffs were doing, which is relevant in Lyon, and it has to be relevant to the question of to what extent Lyon applies. Absolutely, Your Honor. The unrebutted record is that the plaintiffs were stopped and arrested while they were going about their daily lives. The record is clear that the plaintiffs were not violating any laws when they were stopped. That is a key distinguishing factor from Lyon's that, as you pointed out, Judge Kristen, the government really doesn't contend with here. Well, so it says that this is their daily lives. Is that what the district court said and what was pled? Well, she describes what each of the plaintiffs was doing when they were stopped. They were driving to the doctor. That's Plaintiff Yolanda Aguilera Martinez. A couple of them were standing in a Home Depot parking lot. One plaintiff was in his car leaving a local store and before Border Patrol agents just blocked him in. So each plaintiff, it's unrebutted that each plaintiff was going about their daily lives, not violating any law when the defendants stopped them. And there is nature of the conduct was what was done every day. That's exactly right. And that's exactly why the plaintiffs can't avoid future stops. So going back sort of to this first question of why the plaintiffs, why do these people have standing? The plaintiffs in this case have standing because they've obviously already been targeted by defendants on lawful practices and because they are standing in harm's way when they go about their daily lives. Let's take Alicia, who's a member of the United Farm Workers as an example. She, her husband and her brother-in-law were stopped on their way home from work in a citrus field along Highway 99. The government takes a lot of stock in plaintiffs only being stopped once and in their view, the defendants not returning to the same place. On page 287 of the supplemental excerpts of record, there is news reporting that's unrebutted that the defendants returned to Highway 99, which cuts through the Central Valley's agricultural heart. That's where they stopped Alicia. Some of them seem to me are going to have trouble because they were stopped, they were held for three days in a three-day operation. Some of them were detained the whole time for the remainder of the operation. So there does seem to be that problem. But could you go back to Judge Schroeder's question about their day-to-day activities? What did the district court say about these findings? I'm sorry, did she make findings about their repetitive conduct? The district court did not make those findings and it's probably because the government didn't raise prospective standing, but she did find that there was no conflict in the facts. So there's just no basis on which this court could hold that the plaintiff's declarations are, for example, not credible. The district court did credit those declarations and there's no basis for a finding of clear error there. All of this evidence was unrebutted. I think again and again we're sort of running into the issue where the government put no evidence in the record. The government put no evidence that its agents were actually conducting the threshold suspicion. We appreciate that, but we're looking for the district court's findings. Go ahead. I guess to circle back to the when government's counsel was arguing, I find it very difficult to read the tea leaves here in terms of the Perdomo case and sort of like what to make of that. But what I don't find difficult is the message that the Supreme Court seems to be giving about like when we're talking about these kinds of injunctions against executive policy, like we're paying attention to those very carefully as the Supreme Court, right? Like we want those to be done with a lot of circumspection. And so again, I'm looking at our Melendrez case and there it says, quote, the district court expressly found that the plaintiffs are sufficiently likely to be seized in violation of the Fourth Amendment. We don't have that finding here. So yes, we do have clear findings about the individual experiences of these plaintiffs that were sympathetic, no doubt. But I don't have the finding that's relevant to this legal standard. And if I have a Supreme Court that is very carefully watching this area and telling us that we need to be doing this close, you know, paying very close attention to the legal requirements, it seems to me that you're arguing we should sort of piece together something that the district court didn't do. And I'm not sure why we should be doing that in this space. I'll address Melendrez first, Your Honor. And what we're arguing is that this court should find that the plaintiffs had standing to seek prospective relief. But you're asking us to make a finding because the district court didn't make that finding. You want us to do it. Not the factual finding, Your Honor. To reach that legal conclusion based on the unrebutted facts that are in the record and the factual findings that the district court did make. And Your Honor is correct, of course, that the finding on irreparable injury was certainly one of the reasons that this court affirmed in Melendrez. But it wasn't the only reason. In Melendrez, what the court said was one of the ways a plaintiff can show he's realistically threatened by a repetition of a violation is when the harm suffered is part of a pattern of officially sanctioned behavior. We're certainly not arguing that it's a default decision, find a pattern automatically at their standing. We think that it's a fact specific analysis. But the findings necessary for this court to arrive at that legal conclusion are in the district court's decision. She found that there is a practice of violating the plaintiff's Fourth Amendment rights and rights under 8 U.S.C. 1357. And she found that that practice is likely to continue based on the defendant's own unrebutted statements. Can I ask you a related? Oh, did I cut you off? I'm sorry. Go ahead. Go ahead, Your Honor. Well, I'm trying to follow up on this. There's a pending motion in the district court filed by the government, a motion for summary judgment, I believe. And it looks like the docket entry we have indicates that the district court has stayed the consideration of the standing arguments, but has not stayed the mootness arguments and consideration of the mootness arguments. I don't think there has been oral argument as far as I can tell, but this is sort of burbling up. So this sort of circles back into Judge Forrest's question. I don't think they're the express findings. I appreciate that that's because the government didn't raise standing. I don't know that she didn't, under our case law, satisfy herself that she had standing in particular because of Melinda's and the Duke. But what about the status of it seems like the district court's waiting for us? I think Your Honor is referring to a motion to dismiss that the government filed and the government followed up that motion with a motion to stay all of the proceedings in the case. Is it a 12B6 motion? It was a 12B6 motion. Okay. I believe they also included jurisdictional arguments that are not at issue here. Okay, but didn't the court enter, the district court enter an order indicating that she was going to wait for us to make a rule on standing and that she was going to go forward with the rest, including I think a mootness argument. Is that right? The district court issued a partial stay order on the government's motion on a couple of the issues just in their motion to dismiss. Was one of them standing? One of them was standing. They're just waiting for us. I mean, the government's argument was the district court was in a bind here. I think her order says this. This is not a trick question. I think it says that, didn't it? Didn't she say she was going to wait to rule on the standing issue pending the outcome of this appeal? She did because the government told her she didn't have jurisdiction over the issues that are before this court. So she was in a bind. Well, I'm not criticizing anybody. I'm trying to figure out what the status quo is. So thank you for that. That's right. Go right ahead. That's right. Briefly, just in response to the government's argument that there are not statements affirming sort of the unlawful conduct of the operations, that's just incorrect. I would point the court in particular to the El Centro Border Patrol sector's response through their authorized Facebook account. Here in Bakersfield, you guys forgot to raid some people, a commenter said. We plan on coming back. The plaintiffs live in Bakersfield and around Kern County. UFW members live throughout the district. The plaintiffs cannot avoid driving down rural roads like Highway 99 to go to work. Alicia, UFW member, cannot avoid that. The defendant's operations have already targeted the plaintiffs in those locations. They have consistently targeted other class members in the same places. That evidence is unrebutted. They have vowed to repeat the operation they already conducted and come back. That is all unrebutted in the record. There is no basis on which to find that this was an inconsistent operation. There's no basis on which to find that the government has conducted any stops lawfully. They put no evidence of that into the record. So to the extent that the court in Lyons was concerned about, is this future stop going to be unlawful? Here, we know that it is. So I think we've heard your argument. We've covered the briefing very thoroughly. That clock is counting back up now. I see. You're well over time. Thank you very much, Your Honor. Do you want to wrap up, please? Is there anything else you need to cover? No, Your Honor. Okay. Thank you for your argument. We'll hear from opposing counsel, please. The government's prepared to waive reply. All right. Did you have anything you wanted to say regarding my inquiry about the status quo and the status of this? I guess it's a 12B6 motion. Is it your read that the district court is waiting for us to rule on standing? I believe that's correct. Refer to the docket for sort of what's the best information, but yes. Okay. Nothing else then. All right. Well, thank you both very much for your very spirited advocacy. It's very helpful and your excellent briefing. We appreciate it very much. Very interesting case. Yes. We'll take this matter under advisement and go on to the next last case on the calendar for the day, please.
judges: SCHROEDER, CHRISTEN, FORREST